IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 CR 00774 |
| | ) | |
| GREGORY CHESTER, et al. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |

**ORDER**

As explained further in the Statement below, the motion to exclude expert testimony regarding firearm toolmark analysis [699] is denied. The motion to exclude testimony of Nicholas Roti [721] is granted in part and denied in part.

**STATEMENT**

Defendant Paris Poe, on behalf of himself and codefendants Gregory Chester, Arnold Council, Gabriel Bush, Stanley Vaughn, William Ford, and Derrick Vaughn, moves to exclude expert testimony on firearm toolmarks and the expert testimony of Nicholas Roti pursuant to Federal Rule of Evidence 702, *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

The first motion objects to the expert testimony of four government expert witnesses who will be called to describe firearm and toolmark comparisons they performed on bullets collected at the scenes of various crimes. Three of the experts are employed as forensic scientists for the Illinois State Police; the fourth is a forensic scientist for the Federal Bureau of Investigation. Three of the experts will be testifying as to similarities between bullets found at different crime scenes; the fourth will be testifying as to the similarity between the bullets found at a scene and test bullets fired from a recovered gun. All the findings to be presented were independently reviewed by a second examiner at the expert's laboratory.

The second motion concerns Nicholas Roti, the Chief of the Bureau of Organized Crime at the Chicago Police Department. Chief Roti is expected to testify about the history of Chicago gangs, particularly the Gangster Disciples and the Black Disciples, the causes and impacts of the decentralization of gangs, the operations of street gangs, and specifically certain behaviors of gang members. Much of this latter type of testimony concerns the support gang members provide each other in committing crimes and the movement of guns between gang members.

Rule 702 allows an expert who has specialized "knowledge, skill, experience, training, or education" to testify about an opinion assuming it will help the jury understand the evidence or

1

determine a fact in issue, is based on sufficient facts or data, is the product of reliable principles and methods, and the expert has reliably applied the principles and methods to the facts of the case. Factors a court may consider under *Daubert* include: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant community. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The *Daubert* inquiry is a flexible one and does not require strict adherence to the *Daubert* factors to guide the analysis of reliability. *Id.* at 141-142. A *Daubert* hearing need not be held in all circumstances. *See United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007).

### I. Toolmark Analysis

The government has already stated that it will not elicit a number of statements (such as that firearm and toolmark analysis is a "science") that the defendants identified as problematic in their motion. *See* Resp. at 2. In their original motion [333], defendants also raised the arguments that toolmark analysis is unreliable and that this case is especially difficult because some of the bullets are only being matched to each other, rather than to a known gun (as is usually the case). Neither of these arguments carries the day.

The government's witnesses employ toolmark analysis using the Association of Firearms and Toolmark Examiners ("AFTE") methodology. That methodology has been almost uniformly accepted among the federal courts. *See United States v. Otero,* 849 F. Supp. 2d 425, 437-438 (D.N.J. 2012), *United States v. Ashburn*, 88 F. Supp. 3d 239, 245 (E.D.N.Y. 2015), *United States v. Cazares*, 788 F.3d 956, 989 (9th Cir. 2015). An extensive discussion of the details of the AFTE methodology can be found in *Commonwealth v. Meeks*, 2006 Mass. Super. LEXIS 474 (Mass. Super. Ct. Sept. 28, 2006).

The Court is persuaded by the detailed and reasoned opinions of the *Otero* and *Ashburn* courts as to the admissibility of toolmark opinion testimony. More briefly stated here, the Court concludes that the *Daubert* factors support the admission of the government's proposed opinion testimony. First, the AFTE method has been tested and subjected to peer review. There are three different peer-reviewed journals that study the AFTE method,[1] and a number of reliability studies have been conducted of the method. *See* Richard Grzybowski, et al., *Firearm/Toolmark Identification: Passing the Reliability Test Under Federal and State Evidentiary Standards*, AFTE Journal, Vol. 35, No. 2, Spring 2003, at 14-22 (Resp. Ex. 2). Although the error rate of the method has varied somewhat from study to study, AFTE examiners have been found to have an error rate in the single digits, sometimes better than algorithms developed by scientists. *See* L. Scott Chumbley et al., *Validation of Tool Mark Comparisons Obtained Using a Quantitative, Comparative, Statistical Algorithm*, 55 JOURNAL OF FORENSIC SCIENCES 953 (2010). Although they are not quantitative, the AFTE does provide qualitative standards and training in those standards. *See United States v. Diaz*, No. CR 05-00167 WHA, 2007 WL 485967, at *9 (N.D.

---

[1] These journals are not without their flaws, *see* Jennifer L. Mnookin et al., *The Need for a Research Culture in the Forensic Sciences,* 58 UCLA L. REV. 725, 754-755 (2011), but not every methodology must meet exacting scientific standards as long as it demonstrates reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999).

Cal. Feb. 12, 2007). Firearm and toolmark analysis is also widely accepted even beyond the judicial system. One expert listed forty-two colleges and universities around the world that offer courses in toolmark identification. *United States v. Wrensford*, No. CR 2013-0003, 2014 WL 3715036, at *5 (D.V.I. July 28, 2014).

The defendants' criticism of the AFTE methodology is not persuasive. They rely on a 2008 National Research Council report that was highly critical of the AFTE method, primarily because it declared that the scientific underpinning of the theory "has not yet been fully demonstrated." Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, National Research Council, Ballistics Imaging (National Academies Press 2008, available at http://books.nap.edu/catalog/12162.html) ("NRC Report") 3. However, the report was a call for further research, declaring on the same page that "we accept a minimal baseline standard regarding ballistic evidence" and on the following page that "in many situations a sufficient level of toolmark reproducibility" can be picked up by measurement as the method is currently used. *Id*. at 3-4. Perhaps an Ohio court of appeals best summarized the report when it wrote:

> Even a sympathetic reading of the [related] 2009 report, however, indicates its primary purpose was to serve as a catalyst for reassessing the scientific premises underlying the various fields of forensic science and to summarize the current state of the research in those fields relative to the challenges raised in the report. It was not its purpose to opine on the long-established admissibility of tool mark and firearms testimony in criminal prosecutions, and indeed the NRC authors made no recommendations in that regard.

*State v. Langlois*, 2013-Ohio-5177, P24 (Ohio Ct. App. 2013). Many courts have been confronted with the NRC's report, but none have concluded that its findings warranted the exclusion of expert toolmark opinion testimony outright. *See, e.g., Otero*, 849 F. Supp. 2d at 430, *United States v. Mouzone*, 696 F. Supp. 2d 536, 569-570 (D. Md. 2009), *United States v. Taylor*, 663 F. Supp. 2d 1170, 1176 (D.N.M. 2009). In fact, the defendants have cited no case in which a toolmark expert's testimony was not found admissible under Rule 702.

As for the defendants' argument that some of the experts will testify regarding the matches of bullets found at separate scenes without a test gun, that is of little moment. It appears experts often test bullets recovered from the same or different locations to determine whether they match before a weapon is recovered. *See, e.g., Commonwealth v. Meeks*, 2006 Mass. Super. LEXIS 474, *5 (Mass. Super. Ct. Sept. 28, 2006) ("Lydon examined under the comparison microscope the two shell casings recovered from the scene, Items # 2 and # 3. After conducting this side-by-side examination, he found that they 'shared sufficient ballistics characteristics to lead to the determination that both were fired from the same [unknown] weapon.'"). Although the conclusion is slightly different ('these bullets were likely fired from the same unknown gun' rather than 'these bullets were likely fired from this particular gun'), the act of analysis is identical and there is no reason to disqualify the experts' testimony on that basis.

For these reasons, the Court denies the defendants' motion to exclude firearm and toolmark evidence. Defendants may still raise issues regarding the NRC report, the actual error rate of toolmark analysis, and other arguments to test the limitations and potential weaknesses of the experts' methods on cross-examination.

**II. Gang Expert Nicholas Roti**

The defendants raise a number of concerns about Chief Roti's proposed expert testimony concerning gangs. First, they assert that Roti is not sufficiently qualified because in recent years he has served in command, has had many administrative duties over his career, has never been an expert witness before, and has not taken sufficient training courses. Next, they argue his testimony is unreliable because it goes beyond the scope of his experiences. The defendants also contest the relevance of Roti's opinions and their usefulness to the jury. And finally, they argue that Roti's historical testimony about Chicago gangs, even if were qualified to provide such testimony, should be excluded as unduly prejudicial under Rule 403.

As to Roti's qualifications and reliability, his credentials are impressive. In addition to serving as the Chief of the Organized Crime Bureau since 2010, his 29 year police career includes extensive work with gangs including as a street officer prior to working his way up the chain in gang-related divisions. *See* Ex. 4. It is true enough, as the defendants argue, that Chief Roti lacks extensive formal academic training relating to street gangs, but the absence of formal academic training does not disqualify him as an expert. Rule 702 says an expert may be qualified "by knowledge, skill, experience, training, *or* education." Fed. R. Evid. 702 (emphasis added). Roti's lack of formal courses in the subject does not preclude him from testifying as an expert based on his experience. *See Perez v. City of Austin,* No. A-07-CA-044 AWA, 2008 WL 1990670, at *9 (W.D. Tex. May 5, 2008) (qualifying psychologist who had "no academic training" in law enforcement psychology because "a lack of specialization within a particular field does not require the wholesale exclusion of an expert's testimony").

So, too, that Roti has never before served as an expert witness does not disqualify Roti from serving as an expert in this case. *See Martinez v. City of Chicago,* No. 07-CV-422, 2009 WL 3462052, at *3 (N.D. Ill. Oct. 23, 2009). Were it otherwise, of course, there would be no expert witnesses; there is a first time for everything. Beyond that fact, it bears noting that there may be more reason to be skeptical of experts with abundant experience testifying than there is for those with little such experience. *See, e.g., Samuel v. Ford Motor Co.*, 96 F. Supp. 2d 491, 495 (D. Md. 2000), *aff'd sub nom. Berger v. Ford Motor Co.*, 95 F. App'x 520 (4th Cir. 2004) ("Both Mr. Carr and Dr. Kaplan are experienced and articulate, but they clearly are advocates for their positions, and their advocacy has been polished and perfected through another rigorous test procedure-repeated testimony in contested cases, where Mr. Carr has taken the side of the auto manufacturer, and Dr. Kaplan that of the plaintiffs."). Based on his years of experience in the police department working on gang-related cases, Roti is qualified to give testimony as an expert witness. To begin disqualifying police officers, who frequently testify as expert witnesses, simply because they have been promoted away from strictly street duties would be to eliminate many of the best and the brightest of officers from testifying as expert witnesses.

That said, social science testimony, such as Roti's proposed testimony about the causes of gang decentralization, must be within the scope of his experience and the product of genuine expertise. *See Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) ("Social science testimony, like other expert testimony proffered under Fed. R. Evid. 104(a) for admission under Rule 702, must be tested to be sure that the person possesses genuine expertise in a field and that her court testimony 'adheres to the same standards of intellectual rigor that are demanded in [her] professional work.'"). "[E]ven a qualified individual may be barred under Rule 702 where

4

the opinion proffered calls for speculation or expertise in a field outside of the expert's purview." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 822 (N.D. Ill. 2013). And here, some of the proposed testimony falls outside Roti's experience. He has certainly had plenty of experience observing the trends and behaviors of gang members, such as what territory is controlled by certain gangs at given times, the hierarchy or lack thereof of certain gangs, and other historical events affecting gangs in Chicago (such as the teardown of public housing). Such testimony has been approved by other courts. *See, e.g., United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013) (allowing testimony regarding the "the structure, purpose, and activities"), *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (permitting testimony regarding gang colors, signs, and activities). However, as the defendants point out, Roti is not a sociologist or academic who studies how certain community factors impact gangs. *Compare, e.g.,* SUDHIR VENKATESH, GANG LEADER FOR A DAY (2008). It would be beyond the scope of Roti's experience as a police officer for him to testify that the destruction of public housing ***caused*** the decentralization of Chicago's gangs. However, Roti can testify that as a police officer he observed gangs decentralize, that public housing was destroyed in many of the neighborhoods controlled by the gangs around the same time, and that changes in territories associated with various gangs followed thereafter. That is all information within the scope of Roti's work and observations as a law enforcement officer specializing in gang-related crime.

Next the defendants argue that much of Roti's testimony fails the Rule 702 requirement that the testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony should not be admitted if it does "not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding of the particular dispute." *United States v. Hudson*, 884 F.2d 1016, 1024 (7th Cir. 1989). This inquiry is often framed as whether the testimony is "well within the ken of most lay jurors." *United States v. Hall*, 165 F.3d 1095, 1105 (7th Cir. 1999). The Seventh Circuit has expressed its skepticism of certain types of gang expert testimony, noting that "[m]ost jurors are aware that gang members deal drugs, commit violent acts, and react unfavorably when their misdeeds are reported to authorities." *United States v. McGee*, 408 F.3d 966, 978 (7th Cir. 2005). *See also, e.g., United States v. Rios*, --- F.3d ---, No. 14-2495, 2016 WL 3923881, at *5 (6th Cir. July 21, 2016) (finding improper, because within the ken of the average juror, gang expert opinion testimony that gangs commonly engage in drug trafficking; share guns; commonly engage in violent disputes with other gangs; and use of violence against those who steal drugs from them); *United States v. Mejia*, 545 F.3d 179, 194-95 (2d Cir. 2008) (district court erred in admitting gang expert testimony concerning facts, such as gun possession, drug trafficking, and violence engaged in by gang because the jury needed no help in understanding facts relating to those subjects).

Some of Roti's testimony is undoubtedly helpful to jurors, such as the requirement that gang members are expected to "stand by while a fellow member confronts or is confronted by a rival" or the behavior of gang leadership in an "ongoing war situation." Ex. 1 at 5. This is the sort of testimony about how gangs operate about which a jury may not be aware. However, testimony that fellow members backing up a gang member perpetrating a crime gives the perpetrator "confidence" and "encourage[s] the commission of the offense" suggest no juror is aware of the concept of peer pressure or has had a group of friends offer encouragement. Such testimony is well within the ken of the average juror and is therefore fails to satisfy Rule 702's requirement that opinion testimony "help the trier of fact to understand the evidence or determine

5

a fact in issue." Similarly, much of the proposed testimony regarding the hiding of guns following shootings (items 6-10 on the government's list in defendants' Exhibit 1 attached to their motion) is well within the knowledge of any juror who has ever watched *Law & Order*. The proposed testimony can perhaps be summed up as "sometimes gang members temporarily hide guns that have been used in crimes, then retrieve them after suspicion has passed." Such testimony reveals nothing about the inner working of the Hobos or any other gang and is intuitive to the average juror. Similarly, the government's third proposed topic – that gang members "often work together and keep guard while fellow members commit criminal offenses" so that a perpetrator need not keep watch himself – is entirely intuitive to the average juror. As described, the government intends to have Roti testify about why a criminal might want to have a lookout. That testimony will not help jurors. Unless he will describe a method of being a lookout that is uncommon and unique to gangs, the mere concept does not warrant expert testimony.

The government has also proposed Roti testify that gang members "enjoy their notoriety, and how they 'throw' their hand signs as encouragement" or "to demonstrate their status." Ex 1 at 5. A juror may not be familiar with the specific hand signs or colors that indicate participation in a given gang. *See United States v. Martinez*, No. CR 13-00794 WHA, 2015 WL 269794, at *2 (N.D. Cal. Jan. 20, 2015) (allowing testimony regarding "different signs, numbers, graffiti, colors, etc. that link VSP with the Norteños"), *United States v. Wilson*, 634 F. App'x 718, 737 (11th Cir. 2015) (affirming allowance of gang expert that testified to "several gang identifiers" such as the color red and clothing bearing the letters "B" and "P"). To the extent that Roti will explain ***what*** the signs of various gangs were, that testimony may well be helpful. But he may not testify as to the mere fact that gang members of "throw" their hand sign or what they "enjoy." The sheer fact that gangs have signs and symbols is well-known.

Finally, the defendants argue that Roti's testimony fails the balancing of Rule 403. Under the rule, testimony may be excluded "if its probative value is substantially outweighed by a danger" of unfair prejudice, wasting time, or presenting needlessly cumulative evidence. Fed. R. Evid. 403. Defendants focus especially on Roti's historical testimony, which will touch on "state and federal prosecutions" of gang members. "Rule 403 balancing is a highly context-specific inquiry" in which level of dispute on the issue, the probativeness of the testimony, and the prejudice all must be weighed. *United States v. Gomez,* 763 F.3d 845, 857 (7th Cir. 2014). Here, the balancing will depend on the depth of Roti's discussion of these past gang prosecutions. Simply noting the prosecutions as a historical event may have some probative value to explain the formation or decentralization of various gangs and explain the origin of the Hobos. However, detailed discussion of the various charges and prison sentences of various gang members would imply the defendants may be guilty by association or otherwise unduly prejudice the jury.

For the reasons discussed above, the defendants' motion to exclude the testimony of Nicholas Roti is granted in part and denied in part. Mr. Roti may testify to his observations of Chicago gangs, including their history, decentralization, and specific episodes of violence, and other relevant historical events (such as the destruction of public housing or prosecutions of gangs). He may not, however, offer opinion testimony as to the causes of gang decentralization or gang violence. He may not go into great detail about past gang prosecutions. He may provide information regarding the obligations of gang membership, the behavior of gang leaders during shooting wars, and any specific identifying signs, colors, or terms used by the gangs in question. He may not, however, opine as to what gang members "enjoy" or the mere fact that gang

members publicly display their gang affiliation. He may not testify, without more information specific to the gangs at issue in this case, that gang members generally hide guns used in crimes and then recover them when suspicion has passed. Further objections to specific testimony may be raised as Chief Roti testifies. Defendant's motion to exclude firearm and toolmark analysis is denied in its entirety.

Date: September 6, 2016

John J. Tharp, Jr.
United States District Judge