## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 13 CR 00774 |
| GREGORY CHESTER, ARNOLD COUNCIL, | ) | |
| PARIS POE, GABRIEL BUSH, WILLIAM | ) | Judge John J. Tharp, Jr. |
| FORD, and DERRICK VAUGHN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons stated below, the government's motion in limine to allow admission of Keith Daniels's prior statements to law enforcement and grand jury testimony [590-3] is granted and defendants' motion to exclude the grand jury testimony statements of Keith Daniels [585] is denied, as is the defendants' request for an evidentiary hearing on this preliminary matter. The government withdrew its request to admit prior statements of Anthony Bluitt, which was included in the same motion; accordingly, the Court has not addressed that portion of the government's motion.

## STATEMENT

The government seeks to introduce at trial the out-of-court statements of Keith Daniels, the younger brother of defendant Arnold Council who was murdered and is therefore unavailable to testify.[1] In 2011, Daniels was arrested for unlawfully possessing a firearm, and shortly thereafter began cooperating with law enforcement and aiding their ongoing investigation of the Hobos street gang.[2] As part of this cooperation, on three occasions in June of 2011, Daniels purchased heroin from defendant Gregory Chester and Individual LD, another member of the Hobos. On April 10, 2013, Chester was arrested for engaging in the 2011 heroin transactions with Daniels. In a recorded jail conversation shortly after his arrest, Chester told a female visitor "[a] motherfucker wore a wire on me [in] 2011. He was working with the feds."

---

[1] Unless otherwise noted, facts set forth here are based on the government's *Santiago* proffer, ECF No. 540.

[2] After his arrest, defendant Gregory Chester told agents that he had taken Daniels under his wing, and Daniels provided information to law enforcement about the Hobos' criminal enterprise beyond the specifics of the heroin buys from Chester. For example, Daniels observed Chester—who he understood was the Hobos' leader—carrying large amounts of cash and firearms, some of which he purchased to provide to other Hobos and to Daniels for protection. Chester also asked Daniels to shoot a rival in the drug trade.

Within hours of Chester's arrest, defendant Paris Poe—without authorization—removed the ankle monitor that he was required to wear as a condition to his state-imposed term of mandatory supervised release. *Id.* at 97. Three days later, on April 13, 2013, Poe and Chester engaged in a recorded, but coded, phone conversation in a call Chester had initiated with Female B. The next day, on April 14, 2013 at 7:44 p.m., Daniels' girlfriend  called 911 to report that Poe—"Poleroski"—had shot Daniels, and that Poe had fled in a "gold Trailblazer." When officers arrived at the address provided by the 911 caller, they found that Daniels had been shot more than ten times; he later died from his wounds. During a search of the surrounding area, law enforcement recovered a video surveillance video that depicted a tan SUV—consistent with a Chevrolet Trailblazer—driving through the area minutes before the 911 caller placed the call to police. Daniels' girlfriend identified Poe as the shooter, and indicated that he approached Daniels' vehicle shortly after he parked and started firing a handgun into the vehicle. As Daniels attempted to escape out of the vehicle's front seat, Poe stood over Daniels's body and shot him repeatedly. Poe disappeared from the Chicago area, but was arrested on May 2, 2013 near Madison, Wisconsin.

Elsewhere, in a recorded call from jail with Female B at about 8:19 p.m., Chester asked if Poe had been communicating with her. Apparently referring to removing Poe's removal of his electronic monitoring device and violation his supervised release, Chester told Female B that Poe "didn't even have to do that"; "that [it] was crazy" to do so but he "understood too though." *Id.* at 98. Chester followed these comments by explaining: "Better be safe than sorry. Better be safe than sorry." When Female B responded, "it gotta be an outcome," Chester laughed and agreed: "Yeah. It's gone be a outcome."

Less than an hour later, Chester spoke to Poe in another recorded call at the jail arranged through Female B. After asking Poe "what happened with it," and commenting on the criminal complaint filed against him," Poe told Chester: "You gonna be alright, Bow," to which Chester replied that "It ain't nothing. You feel me? Mainly hearsay." About twenty minutes later, in yet another recorded call, Female B connected Chester to an unidentified male who referred to a Trailblazer and told Chester: "Shit just got real." Chester replied: "Played me like a straight bitch."

The day after Daniels' murder, defendant Arnold Council's mother (also Keith Daniels' mother) engaged in a recorded jail conversation with Council and informed him that Daniels had been killed. Council told his mother that he was not surprised because Daniels was a "snitch" and could not have expected to live. Council told his mother that he hoped the younger people in his family would take heed of what happens to those who inform.

## I.    Application of Rule 804(b)(6)

The government seeks to introduce the out-of-court statements Keith Daniels provided to investigators during the course of his government cooperation, under the forfeiture-by-wrongdoing exception to the rule against hearsay. *See* Fed. R. Evid. 804(b)(6).[3] That exception

---

[3] Of course, because the government is attempting to admit the out-of-court statements of Daniels against a defendant in a criminal case, there is the potential for a corresponding Sixth

provides that the hearsay statement of an unavailable witness may be admitted if that statement is "offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result."

To admit a declarant's out-of-court statement under the forfeiture-by-wrongdoing doctrine, the government must establish by a preponderance of the evidence that: (1) that the defendants intended make the declarant unavailable to testify, (2) the defendants engaged or acquiesced in wrongdoing, and (3) that the wrongdoing caused the declarant to be unavailable. *United States v. Scott*, 284 F.3d 758 (7th Cir.2002). The defendants argue that the forfeiture by wrongdoing exception is inapplicable because there is no evidence that they intended to make Daniels unavailable to testify in *this case* and—even if there was such evidence available—that the government has failed to prove that each defendant acquiesced to the Daniels murder. The final element—Daniels' unavailability—is unfortunately beyond dispute.

### A. Defendants' Intent to Make Daniels Unavailable to Testify

The defendants offer two arguments regarding intent. First, they maintain that the government must prove that the defendants intended to prevent Daniels from testifying in this specific case. Second, they argue that the government has failed to offer any evidence that the defendants intended to prevent Daniels from testifying at all. They miss the mark with both arguments.

Although there is a dearth of Seventh Circuit case law delineating the boundaries of forfeiture-by-wrongdoing exception, it is clear is that Rule 804(b)(6) requires that the defendants—in making Daniels unavailable—must have intended to prevent him from testifying. *Giles v. California*, 554 U.S. 353, 366 (2008); *Scott*, 284 F.3d at 764. As the Court explained in *Giles*, it is not enough that a defendant cause a witness to be unavailable; for the exception to apply, the defendant must have intended to prevent the witness from testifying. *Giles* simply made clear that the forfeiture-by-wrongdoing doctrine is an anti-witness tampering rule; absent intent to prevent testimony, the rule does not permit the introduction of hearsay statements by an unavailable witness even if the defendant was responsible for the witness's unavailability.

The government's proffered evidence is more than sufficient to support a finding under Rule 104(a) that Poe and Gregory Chester caused Daniels' unavailability to testify about Chester's drug trafficking and other matters relevant to the Hobos enterprise. Accordingly, it is admissible under Rule 804(b)(6). The defendants argue, however, that the forfeiture-by-

---

Amendment Confrontation Clause issue. *See Giles v. California*, 554 U.S. 353, 366 (2008). But because "it is well established that a defendant forfeits his Confrontation Clause rights by wrongfully procuring the unavailability of a witness," which is precisely the question that the application of Rule 804(b)(6) turns on, any Sixth Amendment issue will correspondingly rise or fall with the availability of the forfeiture-by-wrongdoing exception. *Id* at 367 (noting that Rule 804(b)(6) is simply a codification of the principle that a defendant forfeits his Confrontation Clause rights by wrongfully procuring the unavailability of a witness); *United States v. Scott*, 284 F.3d 758, 762 (7th Cir. 2002) (same); *see also United States v. Ochoa*, 229 F.3d 631, 639 (7th Cir. 2000) (same).

wrongdoing exception requires that they must also have intended to prevent Daniels from testifying in ***this*** particular case. Defs.' Mot. to Exclude Statements of Keith Daniels, 2-6, ECF No. 585 ("Defendants' Motion"). And since this case had not been initiated at the point that Daniels was murdered, they argue, neither Poe nor Chester could possibly have intended to prevent him from testifying in this case and, therefore, the exception does not apply.

The defendants misread *Giles*. In that case, the defendant was on trial for murdering his wife, and the prosecution sought to introduce a number of the wife's statements that incriminated the defendant in her murder.[4] The California state court allowed her statements to be admitted under California's version of the forfeiture-by-wrongdoing exception without evidence that Giles, the husband, murdered her to prevent her from testifying against him. In recounting the history of the forfeiture-by-wrongdoing doctrine, the Court observed that, "in the typical murder case involving accusatorial statements by the victim," evidence that the murder had been committed to prevent the victim from testifying was absent.

But *Giles* was ***not*** "the typical murder case involving accusatorial statements by the victim" relevant to nothing other than the charge of murder, as the Court went on to point out. The Court noted that in the context of a case involving domestic abuse, like *Giles*, evidence of the victim's prior statements about the abuse would be admissible in a murder trial where the evidence showed that the defendant's intent was to prevent the victim from reporting the abuse or cooperating with a criminal investigation of such abuse:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. ***Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution***—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Giles*, 554 U.S. at 377 (emphasis added).

Thus, in *Giles*, the Court did not hold that the murder victim's statements were inadmissible under the forfeiture-by-wrongdoing exception. Recognizing that the statements made to law enforcement would be "highly relevant" to the question of whether the murder was

---

[4] Specifically, some three weeks before Giles shot his wife, a police officer had responded to the Giles' home on a domestic violence call. Giles' wife told the officer that Giles had accused her of having an affair, choked her, and threatened to kill her if she cheated on him again. 554 U.S. at 356-57.

motivated by an intent to prevent testimony about prior abuse, the Court remanded the case for consideration of the defendant's intent in causing his wife's unavailability by killing her. The defendants' interpretation of the case—that application of the forfeiture-by-wrongdoing doctrine required an intent to prevent testimony about the murder itself (which of course the victim of the murder could not provide)—plainly is not correct; were it so, no remand would have been required.

Nothing in *Giles*, or in Rule 804(b)(6), suggests that the element of intent must be tied to the specific prosecution against which the defendants are defending, as the defendants maintain. *Giles* teaches instead that the intent required by the forfeiture-by-wrongdoing exception is not the intent to prevent testimony in the specific case in which the defendant is charged, but to prevent the testimony about the defendant's prior conduct that would be relevant to provide a motive for silencing the witness. So understood, the exception fits comfortably in this case: Daniels made statements to law enforcement that incriminated Chester in drug trafficking and other aspects of the operation of the Hobos enterprise; once that information became known to Chester and Poe, they had substantial motives to prevent Daniels from testifying against Chester in any case in which that information was relevant.

Consistent with this interpretation, other courts have uniformly adopted the view that application of Rule 804(b)(6) requires only an intent to prevent relevant testimony against the defendant, not an intent to prevent testimony in the current prosecution. As the Fourth Circuit noted in *United States v. Gray*, "[t]he text of Rule 804(b)(6) requires only that the defendant intend to render the declarant unavailable 'as a witness.' The text does not require that the declarant would otherwise be a witness at any *particular* trial." 405 F.3d 227, 243 (4th Cir. 2005); *see also, e.g., United States v. Dhinsa*, 243 F.3d 635, 652 (2d Cir. 2001) (endorsing a broad reading of Rule 804(b)(6) in favor of public policy); *United States v. Emery,* 186 F.3d 921, 926 (8th Cir. 1999) (forfeiture by wrongdoing exception applies in subsequent litigation that had not commenced at time of wrongful action); *United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir. 1996) (in applying forfeiture-by-wrongdoing exception to testimony of witness who was murdered prior to defendants' indictment, explaining "we can discern no principled reason why the waiver-by-misconduct doctrine should not apply with equal force if the defendant intentionally silences a potential witness.").

This broader reading of Rule 804(b)(6) also makes sense in light of what the *Giles* Court observed would otherwise result in an "intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them." *Giles*, 554 U.S. at 365. Narrowly limiting Rule 804(b)(6)'s application to specific pending cases known to those seeking to silence witnesses would not deter such conduct but rather accelerate it, by incentivizing defendants to strike first (before the parameters of some future prosecution became known), rather than waiting for a potential indictment to materialize. *See Houlihan*, 92 F.3d at 1279-80. Thus, for purposes of Rule 804(b)(6), it suffices that it was known that Daniels was a potential witness as to Chester's misconduct in ***some*** case arising from the information that the victim was expected to provide when testifying; application of the rule does not depend on the fortuity of whether that case has actually been filed when the witness is silenced.

As something of a fallback position, the defendants maintain that "the vast majority of the information that the government seeks to admit through Mr. Daniels' grand jury testimony is simply outside the scope of Mr. Chester's federal drug case." Defs.' Mot, 6. If Daniels was killed to keep him from cooperating, their argument goes, the intent was limited to preventing him from implicating Chester in drug trafficking, because that is the only information Daniels was known to have provided to law enforcement. At most, they contend, only Daniels' testimony about Chester's drug trafficking (as opposed to other aspects of the Hobos enterprise) can be admitted under Rule 804(b)(6).

That is a rather myopic perspective on what the discovery of Daniels' cooperation revealed. Once Chester and others knew that Daniels was cooperating with federal agents, they should, and likely would have known he had every reason to tell the government *everything* he knew about their criminal activity, not just the information about his drug purchases from Chester. It would be absurd to imagine that Chester, upon learning that Daniels "wore a wire on me," concluded that the only risk Daniels posed to him was testimony about drug trafficking when he knew the extent of Daniels' knowledge about his role in the Hobos, his access to large amounts of cash and to firearms, his purchase of firearms for other members of the Hobos, and his solicitation of murder. And indeed, the affidavit supporting the complaint in his criminal drug case indicates that Daniels (identified in the affidavit as the "Cooperating Source," or "CS," had been providing information in "numerous other . . . investigations related to narcotics, firearms, and murder," Aff. Supp. Compl., ¶ 5, 13 CR 288, ECF No. 1, so Chester and other members of the Hobos with whom Daniels had relationships had every reason to believe that Daniels' cooperation would include provision of information relating to their activities.

All that said, the government must still show, by a preponderance of the evidence, that the defendants intended to prevent Daniels from testifying against them at all. The motive to kill Daniels, they argue, was to retaliate against him for putting Chester in jail, not to keep him from testifying against Chester. Defs.' Mot., 12-17. It is of course a reasonable inference that Daniels was killed for revenge. But it is no more reasonable than the inference that he was killed to prevent him from testifying, and indeed the two motives often go hand-in-hand. *United States v. Duarte*, 28 F.3d 47, 49 (7th Cir. 1994) (indicating there is little distinction "between vengeful and instrumental retaliations" against witnesses). What's more, there is no requirement to choose between these motives; because an actor's intent is almost always inferred from circumstantial evidence, the government "need only show the defendant was motivated *in part* by a desire to silence the witness." *Dhinsa*, 243 F.3d at 654 (emphasis added); *see also, e.g.*, *United States v. Jackson*, 706 F.3d 264, 265 (4th Cir. 2013) ("so long as a defendant intends to prevent a witness from testifying, the forfeiture-by-wrongdoing exception applies even if the defendant also had other motivations for harming the witness"). Here, the proffered circumstantial evidence under a preponderance standard—*i.e.*, more likely than not—establishes that Poe, with Chester's knowledge and blessing if not at his direction, killed Daniels to keep him from testifying against Chester and the Hobos, among other reasons for the killing.

That Daniels was killed within days of Chester's arrest suggests that Chester and Poe intended to strike before the prosecution could proceed any further. Chester knew immediately upon his arrest that Daniels had cooperated against him, and within hours Poe cut off his ankle bracelet and was off the grid. When he materialized three days later, he had a coded phone

conversation with Chester. The next day, Chester queried Female B about whether Poe had been in contact with her and explained to her that, although Poe didn't have to do what he had done (*i.e.*, violating his supervised release conditions by cutting off the electronic monitoring device), it was better to "be safe than sorry." This comment reflects not only an intent to kill Daniels but to do so to keep him from cooperating. Retaliation itself would not make Chester safe; rather, it was preventing Daniels from testifying that would do so. That purpose for Poe's action was confirmed when Chester spoke to Poe less than two hours after Daniels had been gunned down and Poe told Chester, "You gone be alright, Bow." Agreeing, Chester then described the evidentiary basis of the case against him as "mainly hearsay," a comment that makes no sense whatsoever unless Chester knew that Daniels was dead and would not be able to testify against him. That Poe and Chester were discussing the effect of Daniels' murder on the strength of the case against Chester reflects that, while they undoubtedly wanted to exact revenge upon Daniels, they also intended to prevent him from testifying.

### B. Acquiescence in the Daniels Murder

Turning to the next element of the forfeiture-by-wrongdoing exception, the defendants maintain that the government has failed to prove by a preponderance of the evidence that Poe in fact murdered Daniels and, even if he did, that there is no evidence that *all* the defendants acquiesced to Daniels' murder. Defs. Mot. 7-11, ECF No. 585. In order for Rule 804(b)(6) to apply, the government must establish that the defendants engaged or acquiesced in the alleged wrongdoing that caused the witness to become unavailable. *See, e.g., Scott*, 284 F.3d at 758. With respect to Poe and Chester, the evidence easily establishes by the preponderance standard—more likely than not—applicable to preliminary questions of admissibility under Rule 104(a) that Poe murdered Daniels with, at a minimum, the knowledge and blessing of Chester. An eyewitness identification of Poe as the shooter, coupled with Poe's actions immediately after Chester's arrest and the discovery of Daniels' cooperation, the conversations between Poe and Chester about the federal complaint, and Chester's confirmations that it's "better [to] be safe than sorry" and "it gotta be an outcome" satisfy the government's burden of proof on this issue. The defendants contest the reliability of the identification and maintain that others had the same motive to kill Daniels, but those arguments do not significantly undermine the probative force of the proffered evidence. They defendants offer no reason why Daniels' girlfriend would falsely identify Poe—whom she knew—as Daniels' killer as the murder was unfolding. Further, the mere possibility (or even the likelihood) that others also wanted Daniels dead raises no material questions, particularly in light of the affirmative evidence that Poe sprang into action almost immediately upon Chester's arrest, conferred with Chester shortly before and after the murder, and then disappeared altogether. Beyond all this, Chester plainly "acquiesced in" Daniels' murder; before he learned of the murder, he confirmed "it gone be an outcome"; afterward, he provided Daniels' a brief and matter-of-fact valedictory: "Played me like a straight bitch."

As the defendants note in their brief, however, none of this says anything about the remaining defendants. In the case of coconspirators, consistent with the concept of *Pinkerton* liability, the forfeiture-by-wrongdoing doctrine applies so long as the act (in this case, the murder of Daniels) that secures the witness's unavailability is reasonably foreseeable to the coconspirators and is within the scope of that conspiracy. *United States v. Thompson*, 286 F.3d 950, 963 (7th Cir. 2002). The defendants dispute this latter point of law. But in *Thompson*, in a

strikingly similar case, the district court admitted the out-of-court statements of a murdered government informant against all members of an alleged drug conspiracy, even though only a few were alleged to have directly participated in the murder. *Id.* at 961. In holding that the forfeiture-by-wrongdoing doctrine applies to a coconspirator if the misconduct was reasonably foreseeable and within the scope of the conspiracy, the Court pointed to the Rule 804(b)(6) drafters' use of the term "acquiesce." The court reasoned that this language expressed an intent to allow imputation of the doctrine to coconspirators because to acquiesce is to engage in an act, and "when an act is done intentionally and voluntarily it is no less valid as a means of waiver than the decision to more directly procure the unavailability of a witness by, for example, murdering a witness oneself." *Id.* at 964. The court also noted this was consistent with *Pinkerton* coconspirator liability, which makes a coconspirator liable for all reasonably foreseeable acts criminal acts that are done in furtherance of that conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647 (1946). Invoking the forfeiture-by-wrongdoing exception consistent with *Pinkerton* liability, moreover, simply makes sense; as the government notes, it would be anomalous to hold a defendant criminally liable for acquiescing to a coconspirator's reasonably foreseeable act, but at that same time find that the act is insufficient to constitute a waiver of Confrontation Clause rights. *See Thompson*, 286 F.3d at 963.

The defendants argue that because *Thompson* was decided before *Giles*, it lacks precedential force. They maintain that applying *Pinkerton* to the forfeiture-by-wrongdoing exception is inconsistent with the *Giles* Court's historical analysis because *Pinkerton* liability did not exist at the time of the founding. "The *Giles* decision," however, "did not materially alter application of the forfeiture-by-wrongdoing exception by requiring the government to prove that the defendant's actions were undertaken for the purpose of preventing the witness from testifying. Instead, the plain language of Rule 804(b)(6) imposes this evidentiary requirement. *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012). Moreover, *Giles* did not address the question of whether *Pinkerton* should be applied in the Rule 804(b)(6) context and, to the extent that it has anything relevant to say on the question, *Giles* indicates that the historical application of the forfeiture-by-wrongdoing doctrine is an equitable one that is appropriate when a defendant acts with the intent to prevent the witness from testifying. *Giles*, 554 U.S. at 371-74. Applying *Pinkerton* in the forfeiture-by-wrongdoing context is entirely consistent with that principle; to enter a criminal agreement that encompasses obstruction of justice and the murder of witnesses, and to acquiesce to criminal conduct done in further of that agreement, is no less an intentional act that calls for shared liability than being the one who actually squeezes the trigger. Thus, so long as preventing government cooperation was within the scope of the conspiracy and foreseeable, one coconspirator's killing of a witness makes Rule 804(b)(6) applicable to all coconspirators who were parties to that conspiracy. *See Thompson*, 286 F.3d at 963; *Dinkins*, 691 F.3d at 384 (citing *Thompson* and holding *Pinkerton* liability to be consistent with *Giles*; "The term 'acquiesce,' within the meaning of Rule 804(b)(6), encompasses wrongdoing that, while not directly caused by a defendant coconspirator, is nevertheless attributable to that defendant because he accepted or tacitly approved the wrongdoing.").

But the question remains what the scope of the defendants' alleged conspiracy was, and whether the government has established by a preponderance of the evidence that the alleged murder of Daniels was executed by Poe as a reasonably foreseeable act done in furtherance of that conspiracy. As to the scope of the defendants' alleged conspiracy, the government offers

ample preliminary evidence to support its argument that the Hobos RICO conspiracy included the objective to "perpetuate the enterprise and to maintain and extend their powers, members of the enterprise and their associates committed illegal acts, including murder, solicitation to commit murder. . . against individuals who posed a threat to the enterprise and jeopardized its operations, including rival gang members and individuals suspected of cooperating with law enforcement." Superseding Indictment, ¶ 8(b), ECF No. 169. Beyond the evidence relating to the Daniels murder, for example, the government's *Santiago* proffer elaborates on this broad scheme, indicating that all of the defendants had sworn their allegiance to the Hobos street gang, and that all engaged in acts of murder and attempted murder. Most significantly, the proffer also details evidence warranting a preliminary conclusion that, years earlier, Council and Poe murdered Wilbert Moore because he provided information to CPD about the Hobo's criminal activity. *Santiago* Proffer, ECF No. 540, at 57.[5] The government also proffers facts indicating that the government's confidential informants feared the Hobos would retaliate against them for cooperating with law enforcement.

The government argues that Poe's alleged murder of Daniels was thus foreseeable to all the defendants because it fits "within the Hobos' pattern and practice of retaliation and murder." Gov.'s Resp. to Defs.' Mot. to Exclude Testimony of Daniels, 8, ECF No. 638. *Pinkerton* only imputes criminal conduct to other members of a conspiracy when the conduct can "be reasonably foreseen as a necessary or natural consequence of the agreement." *United States v. Gutierrez*, 978 F.2d 1463, 1468 (7th Cir. 1992). In the context of *Pinkerton* liability, a defendant's actual knowledge of a criminal act is not necessary for it to be considered foreseeable. *See Pinkerton*, 323 U.S. at 647; *United States v. Sandoval-Curiel*, 50 F.3d 1389, 1392 (7th Cir. 1995) ("[*Pinkerton* liability] applies even if the defendant does not participate in the substantive offense or have any knowledge of it."). Rather, the act must be reasonably foreseeable, and evidence that coconspirators engaged in similar conduct provides a strong basis for such an inference. *See, e.g., Thompson*, 286 F.3d at 966; *see also United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003) ("[I]n light of the testimony showing that the conspirators in this case frequently resorted to violence to achieve their goals, Curtis's argument that the killing was not reasonably foreseeable is wholly without merit.").

There is enough within the government's *Santiago* proffer for the court to conclude preliminarily that the murder of Daniels was within the scope of the alleged criminal conspiracy because it served the Hobos' goal of preventing cooperation with law enforcement. See also Order on Mots. to Sever Count Six and/or Defendant Poe, ECF No. 564. That murder was also a reasonably foreseeable act done in furtherance of the conspiracy because all of the defendants had allegedly engaged and/or endorsed similar acts of violence in the past. Accordingly, the government has established by a preponderance of the evidence that Daniels' statements may be admitted under Federal Rule of Evidence 804(b)(6).

---

[5] As evidentiary support for the Wilbert Moore murder, the government's proffer indicates that a confidential informant will testify that he was with defendant Bush at a barbershop when they spotted Moore. *Id.* at 58. Bush then called Council and told him that Moore was outside the barbershop; shortly after Council arrived with Poe. *Id.* The informant then allegedly observed Council and Poe chase Moore down and shoot him in a vacant lot. *Id.*

## II.     Rule 403 Analysis

The defendants also argue that Daniels' hearsay statements should be excluded under Rule 403. Defs.' Mot., 18-20. Federal Rule of Evidence 403(b) allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403(b). The defendants argue that the government's decision not to use Daniels' statements against defendant Chester in his drug case reflects their limited probative value, but the government's decision not to offer Daniels' prior testimony in the drug trafficking prosecution against Gregory Chester has no bearing on the admissibility of that testimony. Nor can it reliably be construed to reflect any reservation about its admissibility or its probative value in that case, much less this one.

The defendants further maintain that Daniels' statements are deeply prejudicial to the defendants because they "contain numerous accusations against the other defendants in this case that are, by definition, outside of Mr. Chester's drug case." Defs.' Mot. 19, ECF 585, Why Daniels' firsthand account of Chester's criminal conduct is not probative, but everything else Daniels' said is "deeply prejudicial," the defendants do not explain. Their concern about "a significant spillover effect" from Daniels' statements about them, moreover, is based on their view, discussed above, that the statements are not admissible against those who did not acquiesce in the murder. But if Daniels' statements satisfy the requirements for admissibility of Rule 804(b)(6) as to all of the defendants—and as discussed above, they do—then there is no issue of unfair "spillover"; the statements are simply evidence that the jury may consider against all of the defendants. In addition to providing information about Chester's drug dealing activities, Daniels provided law enforcement with more general information about the Hobos' criminal enterprise. Although this information may or may not have been relevant in Chester's drug case (or may have been withheld strategically), it is relevant in evaluating the defendants' participation in the charged RICO conspiracy. There is no prejudicial "spillover" from evidence that is admissible against all of the defendants.

Finally, the defendants also complain that they are unfairly prejudiced by their inability to cross-examine Daniels. Undoubtedly, the inability to cross-examine a witness prejudices a defendant, but in the context of the application of Rule 804(b)(6) the prejudice is not unfair. The foundation of the forfeiture-by-wrongdoing exception is recognition that there is no unfairness in introducing testimony that is not subject to cross examination when the defendant(s) against whom the testimony is offered eliminated the prospect of cross-examination by causing (directly or by virtue of *Pinkerton* liability) the witness's unavailability. The Court therefore concludes that the probative value of Daniels's testimony is not substantially outweighed by its prejudicial effect, making exclusion under Rule 403 unwarranted.

## III.     Request for an Evidentiary Hearing

The defendants argue that an evidentiary hearing is required to determine the extent that Daniels' statements are admissible. Defs.' Mot. 20-21, ECF No. 585. The government maintains that a hearing is unnecessary because it would simply be redundant of what would be produced at trial. Gov.'s Resp. 18-19, ECF No. 638.

10

An evidentiary hearing is unnecessary. Preliminary questions of admissibility are governed by Federal Rule of Evidence 104(a), which instructs that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules." Fed. R. Evid. 104(a). Thus, because the Rules of Evidence do not apply to this preliminary determination of the admissibility of Daniels' statements, the Court may consider hearsay statements and the statements of coconspirators that have not yet been admitted. *Cf. Bourjaily v. United States*, 483 U.S. 171 (1987) (coconspirator statements can be considered as evidence of membership in conspiracy in determining whether coconspirator statements are admissible at trial). Moreover, virtually all of the evidence on which the government bases its argument for the admission of Daniels' statements will be introduced at trial, so a preliminary hearing would simply duplicate a substantial portion of a trial. *United States v. White*, 116 F.3d 903, 915 (D.C. Cir. 1997) (rejecting request for evidentiary hearing to decide admissibility under forfeiture by wrongdoing exception); *cf. United States v. Andrus*, 775 F.2d 825, 837 (7th Cir. 1985) (noting, in context of consideration of admissibility of coconspirator statements, that a pretrial evidentiary hearing results in duplication of efforts and is in any event imperfect and inefficient because the evidence at trial may differ and the pretrial ruling is only preliminary). That would, of course, be inefficient under any circumstances, but it would be particularly so here, because in addressing the parties' respective motions *in limine* on this question, the Court is making only a provisional, preliminary determination that the government has established by a preponderance of the evidence that the forfeiture by wrongdoing exception applies.

As such, "[t]he ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. *Luce v. United States*, 469 U.S. 38, 41 (1984); *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006) ("the district court may adjust a motion in limine during the course of a trial"); *United States v. Marino,* 200 F.3d 6, 11 (1st Cir.1999) ("[R]ulings on motions *in limine* normally are considered provisional, in the sense that the trial court may revisit its pretrial evidentiary rulings ...when an evidentiary proffer may be more accurately assessed in the context of the government's other evidence."). In short, the Court will have the opportunity at trial to evaluate the government's evidence to support the admission of Daniels' statements, so an advance evidentiary hearing for the same purpose is just unnecessary. *See United States v. Baskerville,* 448 F. App'x 243, 250 n. 5 (3d Cir.2011) (District Court's decision to forgo a "mini-trial" on admissibility of murdered witness's statements was reasonable); *United States v. Jimenez-Bencevi*, 2013 WL 1429445, *2 (D. Puerto Rico April 5, 2013) (not necessary to hold pretrial evidentiary hearing to prove that the forfeiture by wrongdoing exception applies); *United States v. Savage,* 2013 WL 372947 (E.D. Pa., Jan.31, 2013) (same). To facilitate the Court's consideration of the foundational testimony bearing on the admission of Daniels' statements, however, and to minimize any prejudice that might arise from the admission of those statements without an adequate evidentiary foundation, absent good cause to proceed differently (which must be raised with the Court), the Court will require the government to introduce the evidence relating to the Daniels' murder before Daniels's statements can be admitted pursuant to Rule 804(b)(6).

\*      \*      \*

For the foregoing reasons, the government's motion *in limine* to admit statements of Keith Daniels pursuant to Rule 804(b)(6) is granted and the defendants' motion *in limine* to bar the admission of those statements is denied.

Date: September 6, 2016

John J. Tharp, Jr.
United States District Judge